Independent School District of Manning, Appellee, v. Julius J. Miller, Appellant.

Julius J. Miller, Appellant, v. H. D. Hinz et al., Appellees.

ACTIONS: Consolidation by Stipulation. Irrespective of the statute (Sec. 3644, Code, 1897), relative to the consolidation of actions, it is competent for parties, with the approval of the court, to stipulate for consolidation and for the terms thereof.

SCHOOLS AND SCHOOL DISTRICTS: Vacancy in Office of Treasurer. The office of school treasurer is a "civil" office and, notwithstanding the provisions of Art. 9 of the Constitution, relative to the state board of education, becomes vacant whenever the incumbent ceases to be a resident of the district. (Sec. 1266, Code, 1897.)

OFFICERS: Vacancy—Permanent Removal from District. An office becomes vacant whenever the incumbent permanently removes from the district for which he was elected or appointed, even though he has *not* taken up a permanent abode elsewhere.

MANDAMUS: Possession of Funds of Public Office—Mandamus (?) or Quo Warranto (?) Mandamus is the appropriate remedy to

compel the turning over of the funds and papers belonging to a public office, and in such case the court will determine whether plaintiff has prima-facie title to the office, even though quo warranto is the sole remedy for finally testing the *title* to the office.

ACTIONS:    Consolidation—Effect of Stipulation.    The agreed consolidation of two separate actions, with stipulation for one decree, brings into existence a new action, with the issues of the former two actions; and a stipulation that such consolidation shall be without prejudice to issues raised in the former actions will not reach the point of determining for the court the judgment which shall be entered on the findings made.

*Appeal from Carroll District Court.*—M. E. HUTCHISON, Judge.

JUNE 28, 1920.

THE above-entitled causes were consolidated, and, on hearing, the relief sought in the first case was allowed, and in the last, denied. The defendant in the first and plaintiff in the last appeals.—*Affirmed.*

*Salinger, Reynolds & Meyers* and *F. H. Cooney,* for appellant.

*E. A. Wissler,* for appellees.

LADD, J.—About the middle of April, 1919, J. J. Miller disposed of his dental practice and office equipment to one McFate, with the understanding that he would quit the practice, June 10th thereafter, and not resume it in Manning while the buyer remained there, without his consent. Miller was serving a two-year term as treasurer of the plaintiff district, beginning July 1, 1918. He appeared at a meeting of the directors in the fore part of June, 1919, saying to the board that he wanted to resign; but acquiesced

in the suggestion that he defer this until July 1st follow-
ing, when the annual settlement would be had.  His annual
report was submitted at that time, and, on the day follow-
ing, the secretary inquired of him by letter concerning his
intentions, to which he responded that he had concluded
not to file his resignation, adding:

"I had hoped that this matter could have been arranged
and a transfer of the office made without a contest for my
successor, but, from all appearances, this will be out of
the question.  I regret exceedingly that this could not be
done without any feeling, as the people of Manning have
been very kind to me, and I dislike to do anything to
create feeling or strife among my friends.  Under all of
the circumstances, it may be best to permit the people to
fill this vacancy at the election in March."

A motion was adopted:

"That, the office of school treasurer being vacated on
account of the removal of the treasurer from the county,
that the board meet in adjourned meeting on Thursday
evening, July 10th, at 8 o'clock, for the purpose of electing
his successor, on condition that all members are present."

At the time so fixed, E. D. Sutherland was elected, and
thereafter qualified as treasurer.  On the next day, the
secretary of the board of directors notified Miller that the
vacancy caused by his removal to that place (Denison)
had been filled by the appointment of Sutherland, and that
he had been "instructed to notify you to turn the funds
and all other property of the district over to him as soon
as possible."  This Miller did not do; and, on August 16,
1919, an action in mandamus was brought, in the district
court of Crawford County, to compel Miller, who then lived
at Denison, to deliver all books, funds, and other property
of the district.  Miller answered, admitting that he retained
the same, but averred that the funds of the district were on
deposit with the Iowa State Savings Bank of Manning,
and warrants paid upon presentation.  In a separate divi-
sion of the answer, he denied that the remedy by manda-

mus was available. Thereafter, in January, 1920, Miller began suit in Carroll County, alleging in his petition the facts recited above; that the board of directors and the president and secretary of the school board were about to certify to the appointment of Sutherland as treasurer of the district; that the board of directors had wrongfully declared the office of treasurer vacant, and had illegally assumed to elect Sutherland as treasurer to fill the alleged vacancy; that the action referred to had been brought in Crawford County; that, should the moneys be turned over to Sutherland, confusion would be caused: and he prayed that the district directors and officers of the board be temporarily enjoined from certifying the election of Sutherland as treasurer to the county treasurer, and that the latter be so enjoined from paying over any of the moneys of the district to said Sutherland as treasurer. The county treasurer interposed a general denial, and the other defendants averred that the funds had been deposited in the bank without authority, alleged that Miller had ceased to be a resident of the district, and prayed that the temporary injunction be dissolved and the petition dismissed.

I.    Miller moved that the case pending in Crawford County be transferred to Carroll County, owing to his alleged residence there, but, as a matter of convenience, counsel arranged that the cause be tried there, without conceding the matter of residence. Both cases came on for trial December 19, 1919. An attorney for Miller explained to the court that, although the causes of action were pending in different counties, all desired to have both determined by the court then sitting in Carroll County, and suggested that a stipulation might be required in order to try the Crawford County case there; that, "if it were consolidated with the Carroll County case, under an agreement that that should not be any concession * * * that Miller is a resident of Manning, as he claims to be, why couldn't there then be a single decree and a single record?"

1. ACTIONS: consolidation by stipulation.

An attorney on the other side remarked that the evidence would be practically the same in each case, and that "a mere stipulation that the two cases are to be consolidated, without waiving any of the rights of either party, that this case can be tried as a Carroll County case in the present term of court." Miller's attorney then undertook to state a stipulation:

"Let it be agreed that the Crawford County case * * * shall be and is hereby, by stipulation and order of the court, consolidated with the Carroll County case * * * but that this consolidation shall be without prejudice to the claims of either party as to their rights involved in the litigation, or to the residence of the defendant, Miller, and that it shall be without prejudice to any claim of fact or law made by either party in the pleadings in either case."

This was acquiesced in by counsel for the school district, and attorney for Miller proceeded:

"I am trying to protect my own interest, you see, because I have a plea in there that the action to compel Miller to turn over the stuff is one which the court may not entertain in the form in which it is brought, and, of course, I desire to have it understood that, in arranging for this consolidation as a matter of convenience, that that point is not waived.

"The Court: Well, it will be so regarded and understood."

It was then agreed that there should be but one decree. It is plain from this recital that the parties understood that none of the issues raised in the several pleadings should be lost by the consolidation, and, regardless of what may be the rule where consolidation is ordered, under Section 3644 of the Code it was competent for the parties, with the approval of the court, to stipulate the conditions on which causes of action which might not have been joined shall be tried together, and we shall take up the several issues as seems most convenient.

II.  Section 1266 of the Code declares that:

"Every civil office shall become vacant upon the happening of either of the following events  *   *   *.

"3. The incumbent ceasing to be a resident of the state, district, county, township, city, town or ward by or for which he was elected, or appointed, or in which the duties of his office are to be exercised."

2. SCHOOLS AND SCHOOL DISTRICTS: vacancy in office of treasurer.

That the office of school treasurer is a civil office is not questioned, but it is contended by counsel for appellant that the statute quoted does not apply to school officers. That section, in so far as it relates to such officers, is like Section 429 of the Code of 1851; and it is argued that, as the board of education was then in control of the school system, and was authorized to legislate with reference thereto, such offices were not contemplated in the last-cited section, or in the like section re-enacted in subsequent Codes. Article 9 of the Constitution of 1857 placed "the educational interests of the state, including common schools and other educational institutions  *   *   *  under the management of a board of education" (Section 1) ; and upon that board (Section 8) was conferred the "power and authority to legislate and make all needful rules and regulations in relation to common schools," the power being reserved in the legislature, however, to alter, amend, or repeal any of the acts, rules, or regulations so adopted. The board, however (Section 10), was denied the power to levy taxes or make appropriations of money. It was required (Section 12) to "provide for the education of all the youths of the state, through a system of common schools, and such schools shall be organized and kept in each school district at least three months in each year." The existing school district was expressly recognized and the laws relating to its organization and officers continued in force by virtue of Section 2 of Article 12, declaring that:

"All laws now in force, and not inconsistent with this Constitution, shall remain in force until they shall expire or be repealed."

There was no inconsistency in Chapters 69 and 70 of the

Code of 1851, providing for the organization of school districts, the election of president, secretary, and treasurer thereof, who constituted the board of directors, and defining their duties, with the provisions of Article 9 of the Constitution; and consequently these must have continued in force, until the board of education was abolished, in 1864. See Chapter 52, Acts of the Tenth General Assembly. We need not inquire whether the board of education had the power to modify or repeal the provisions of Chapters 69 and 70 of the Code of 1851, it being enough to say that it did not undertake to do so. The duties of treasurer were defined in Section 1138 *et seq.* of that Code, substantially as in the Code of 1897. It is argued, however, that, as Section 436 of the Code of 1851 did not provide for filling vacancies in school offices, and no authority existed, it should be held that Section 1266 of the Code should be construed not to include such offices. This assumes too much; for, under Section 1151 of the Code of 1851, it is provided that:

"Should a vacancy occur in the board, they may fill the same by appointment unless it is deemed expedient to call a special meeting of the district for the purpose."

As the treasurer was *ex officio* a director of the board, this included the power to fill the vacancy in the office of treasurer. Section 2771 of the Code, 1897, provides for filling vacancies in school offices, as does the statute quoted; and, as Section 429 of the Code of 1851 was the only statute declaring the event which created a vacancy, as is Section 1266 of the Code of 1897, we are of opinion that these last-named statutes should be construed as including all that their language imports, "every civil office." The history of the legislation on which appellant relies, furnishes no ground on which to base a holding to the contrary. Though Section 1272 of the Code, appearing in the same chapter as Section 1266, provides for filling about every vacancy other than that of school offices, we are of opinion that the latter section should be accorded the meaning its language purports, and that the words "every civil office" should be held to include school offices, and that the office of school treas-

urer becomes vacant whenever that officer ceases to be a resident of the district.

III.   Had Miller ceased to be a resident of Manning at the time of the appointment of his successor in office? This issue was raised in the pleadings of each party in the suit brought in Carroll County, and its decision is essential to determine whether the appointment of Sutherland as treasurer of the district should be certified to the county treasurer, and to which the county treasurer should turn over the moneys collected for the district.   As said, Miller went before the board of directors, about the 1st of June, with the purpose of resigning.   Concerning this, the president of the board testified that Miller then said:

3.  OFFICERS: vacancy: permanent removal from district.

"We are about to leave Manning; I thought I would come in and see the board in regard to my resignation."

Another member of the board remembered that he said that "we all knew that he was about to leave, or something to that effect;" and still another member, that he "gave as the reason that he was going to leave Manning; said he was going to Denison."   This witness also related that Miller had told him that:

"He was going to move to Denison, and that he would see me, and that he would be back to finish my work   *   *   * that he had sold out, and was going to leave Manning."

His brother, by whom he was employed at Denison, swore that he was engaged for no definite time; that his brother had refused to go into partnership with him, because, as he said, he wished to be free to go, just as he liked.   When he moved into his father's residence, his goods were stored in the building where he first moved.   Dr. Sinn, still another member of the school board, recalled that, when Miller attended the meeting, he had said "he would have to resign, because he was going to move to Denison."

On the other hand, it appears that Miller disposed of his dental practice because of wishing not to be confined in the office; that he voted on the road question in Manning, in the fore part of September, 1919.   He was an assistant

cashier of the Iowa State Savings Bank, in Manning, and had given some attention to the work in the bank, of which he was a director. The main reason for being assistant cashier, however, was to enable him to sign papers when the cashier was absent. According to his testimony, the bank had offered him permanent employment there, which he had not accepted. He explained that, though living at Denison, he had arranged with the bank to pay school warrants as they came in, but had never learned that payment might not be made from one fund to satisfy a warrant drawn on another, nor had exacted of the bank a depository bond, as exacted by Section 2768 of the Code Supplement, 1913. He testified further that he had packed his goods at different times, and shipped them to Denison June 4th or 5th; received no definite salary from the bank; purchased some residence lots in Denison as an investment, but had not considered building on them; that his purpose in disposing of his business and residence in Manning was to take a rest; that, in selling, he did not know where he intended to go, nor had he determined to leave Manning; that he collected rent on his house, subsequent to its sale, and the deal was not to be consummated until March 1st following; that his intention in going to Denison was to see if another line of work would agree with him better than dentistry; that he made no arrangement as to how long he would stay there; that he declined to take an interest in his brother's business, because he wanted to be free to go; that he was simply experimenting, to see if he would be satisfied with Denison; that he never entertained the purpose of abandoning his home or residence in Manning; that, in taking a vacation, he concluded not to be bothered with the responsibility of the treasurership, and that explained his purpose to resign; that, when he found the school board would not elect a successor in office who would keep his deposits in the Iowa State Savings Bank, he concluded not to resign; that, when he found that one of those who had promised to vote for his candidate to succeed him did not do so, he concluded not to resign; that "he wasn't certain,

if the purchaser of his house failed to pay for it, and he had to take it back, that he would want to go back to Manning." Such is the evidence on which the trial court based its finding that appellant had changed his residence. That he in fact moved from Manning to Denison about June 1, 1919, is not controverted. If this was a mere temporary absence, it was not sufficient to create a vacancy. *State v. Hemsworth,* 112 Iowa 1. It is sufficient if he remove from the district where the duties of his office are to be exercised, permanently, without the intention of returning. *Curry v. Stewart,* 8 Bush (Ky.) 560; *Inhabitants of Barre v. Inhabitants of Greenwich,* 18 Mass. 129. If he has left such district without intention of returning, and yet not taken up his permanent abode elsewhere, the office will have become vacant; for all that is necessary, in order to render the office vacant, is that the incumbent cease to be a resident of his district. This may happen without his having acquired a domicile elsewhere, as seems to be essential to lose the right to vote. See *State v. Savre,* 129 Iowa 122.

The evidence leaves little or no doubt as to Miller's purpose in leaving. He does not say that he intended to return. He disposed of everything connected with his profession as a dentist, and, by agreement, obviated engaging therein again. He disposed of his residence, and shipped everything he had, save his bank stock, to Denison. He told the members of the school board he intended to leave Manning, and, about the same time, published the following in a local newspaper:

"To My Friends and Patrons: Having sold my dental practice and am moving to Denison, Iowa, I take this means of extending my thanks and appreciation for the business and hearty co-operation that I have received during the sixteen years that I have practiced my profession here in Manning. It is with a feeling of regret that I am to leave the good old home town, not only because it is the town in which I have lived for nearly thirty years, and where I spent my boyhood days, and where I graduated from the high school, but because of the many friendships formed

and the hearty support received while in practice here. Denison is not very many miles away, and I hope to see you all occasionally. Again thanking you one and all for the patronage and business that you have given me, I herewith bid you all farewell. if I do not get to see you personally. With the best of wishes, Dr. J. J. Miller."

Would anyone sound such a farewell who was not intending to sever his relations of neighbor and resident forever? We entertain no doubt that his departure was with the design of leaving permanently, and that, upon his departure, the office of treasurer became vacant.. This being so, the petition filed in the district court of Carroll County was rightly dismissed, and the temporary restraining order dissolved.

IV. The suit was brought in Crawford County to require Miller to deliver to his successor in office the books, funds, and other property of the office. One of his defenses was that, as the right to such office was in issue, action in mandamus was not the proper remedy; that title to office may be contested only in quo warranto proceedings. Nothing is better settled than that title to a public office may not be adjudicated in an application for a writ of mandamus. Equally as well settled, however, is the rule that, in such a proceeding, sufficient investigation may be made to ascertain whether the plaintiff has a prima-facie title to the office, and, if it be so found, then mandamus is the appropriate remedy to obtain possession of the books, funds, property, and insignia of the office which constitutes the subject of inquiry. *Cruse v. State,* 52 Neb. 831 (73 N. W. 212); *Ewing v. Turner,* 2 Okla. 94 (35 Pac. 951); *Cameron v. Parker,* 2 Okla. 277 (38 Pac. 14). The authorities are gathered and reviewed so thoroughly in the last-cited case that further citation is unnecessary. See 26 Cyc. 258. A proceeding in quo warranto is appropriate for testing title to office. *Vette v. Byington,* 132 Iowa 487. See, also, *Nelson v. Consolidated School Dist.,* 181 Iowa 424. Nothing

*Marginal note: 4. MANDAMUS: possession of funds of public office: mandamus (?) or quo warranto (?)*

to the contrary is to be found in *City of Keokuk v. Merriam,* 44 Iowa 432. Indeed, it is recognized there that mandamus is the proper remedy to compel the performance of an official duty, and that it is the duty of an incumbent to turn over the books, funds, property, and insignia of office, upon retirement from office, to his successor. See, also, *Prescott v. Gonser,* 34 Iowa 175, and *Benjamin v. District Township,* 50 Iowa 648. The remedy is summary, and its design, in a situation like that presented, is to avoid confusion and conserve the public good, by putting the claimant having prima-facie title in possession of the office and all property rightly connected therewith. The title thereto, if contested, may not be adjudicated in such proceeding, but can be tried thereafter.

Our only inquiry, then, is whether Sutherland had a prima-facie right to the office. There is no controversy but that Miller, who had been the treasurer, then resided and was employed in Denison, the county seat of an adjoining county, about 22 miles from Manning. Owing to this, Sutherland had been appointed to the office of treasurer in his stead, and had qualified. To authorize this, the board of directors was not required to wait for the adjudication of the existence of a vacancy. The fact of vacancy was enough to warrant the board in taking action; and, had there been no one in possession or claiming the office, the appointee would have been entitled to the books and property incident thereto. The rule is thus laid down in *State ex rel. Leal v. Jones,* 19 Ind. 356:

"Where it appears, *prima facie,* that acts or events have occurred, subjecting an office to a judicial declaration of being vacant, the authority authorized to fill such vacancy, supposing the office to be vacant, may proceed, before procuring a judicial declaration of the vacancy, and appoint or elect, according to the forms of law, a person to fill such office; but if, when such person attempts to take possession of the office, he is resisted by the previous incumbent, he will be compelled to try the right, and oust such incumbent, or fail to oust him, in some

mode prescribed by law.  If such elected or appointed person finds the office, in fact, vacant, and can take possession, uncontested by the former incumbent, he may do so, and, so long as he remains in such possession, he will be an officer *de facto;* and, should the former incumbent never appear to contest his right, he will be regarded as having been an officer *de facto* and *de jure;* but, should such former incumbent appear, after possession has been taken against him, the burden of proceeding to oust the then actual incumbent will fall upon him; and if, in such proceeding, it is made to appear that facts had occurred before the appointment or election justifying a judicial declaration of a vacancy, it will be then declared to have existed, and the election or appointment will be held to have been valid."

See, also, *Dew v. Judges of Sweet Springs,* 3 Hen. & M. (Va.) 1 (3 Am. Dec. 639); notes to *State v. Dunn,* (Ala.) 12 Am. Dec. 25; *People v. Olds,* 3 Cal. 167 (58 Am. Dec. 398); *McKannay v. Horton,* (Cal.) 13 L. R. A. (N. S.) 661. We are inclined to entertain the view expressed in *State ex rel. Leal v. Jones,* supra. The right to the office depends, in such a case, on whether there was, in fact, a vacancy, rather than on the appointment by the board of directors to fill the alleged vacancy; for such appointment would be invalid, should it appear that no vacancy, in fact, existed. In determining, then, whether there was a vacancy, the court necessarily passes on the issue as to which of the two persons is entitled to the office, and this may not be determined in an action in mandamus.

V.  But the cases were consolidated on conditions heretofore recited. The issues raised in the two cases were to be heard in the consolidated cause. The parties, in so

5. ACTIONS: consolidation: effect of stipulation.

stipulating, appear to have recognized that the suits might not have been joined, and that, for this reason, consolidation might not have been effected on motion, under Section 3644 of the Code. The one was a summary proceeding to obtain possession of the books and funds belonging to the

district, while the other sought to enjoin the certification by the several defendants to an appointment, and to enjoin another from the payment of public moneys. Ordinarily, a cause of action in mandamus and a suit to enjoin will·not be joined in one action. See *Whigham v. Davis,* 92 Ga. 574 (18 S. E. 548.) In determining whether causes in equity shall be consolidated, identity of subject-matter is largely controlling. *Cox Shoe Co. v. Adams,* 105 Iowa 402. It was ruled in *Browne v. Hickie,* 68 Iowa 330, that:

"When the two causes were consolidated, a new action was formed, which was distinct in its identity from both of them. Neither of the claims alleged by plaintiff remained to be tried, after the consolidation, as a separate issue, but a new issue was presented, which included all of them. When the parties consented to the consolidation, they, in effect, agreed that the two separate actions should be discontinued, and a new and distinct action should be created, in which should be included and litigated all of the questions presented by the pleadings in both of the former actions; and the power and jurisdiction of the courts with reference to this new action were the same as though it had been brought in the manner in which actions are ordinarily instituted."

The same rule obtains in several states, owing to statutory provisions, in suits of an equitable nature. See *Peterson v. Dillon,* 27 Wash. 78, 85 (67 Pac. 397); *Eastern Wis. R. & L. Co. v. Hackett,* 135 Wis. 464, 472 (115 N. W. 376). In other states, however, where consolidation of causes pending in equity is effected, it amounts practically to no more than a trial of the different suits at the same time, and separate decrees are entered. *Handley v. Sprinkle,* 31 Mont. 57 (77 Pac. 296, 3 A. & E. Ann. Cas. 531); *Holmes v. United States Fire Ins. Co.,* 142 Fed. 863. This result was obviated by the understanding that there should be a single record and a single decree, though the parties specifically agreed that "this consolidation shall be without prejudice to the claims of either party as to their rights involved in the litigation, or to the residence of the defendant

Miller, and that it shall be without prejudice to any claim of fact or law made by either party in the pleadings of either case," Miller's attorney adding, in substance, that he wanted to make sure that, "in arranging for this consolidation as a matter of convenience," he did not waive the point that an action in mandamus may not be maintained for the possession of the books and property of the office. But the parties did not undertake to say, nor might they, what should be the consequence of the conclusions reached by the court on the issues raised in the case as consolidated. The issue as to the residence of Miller was rightly before the court in the consolidated action, brought in with the suit to enjoin, and must have been so regarded; for there was no objection to the introduction of evidence bearing on that issue. The decision thereon in the district court, as in this court, was tantamount to declaring that Sutherland had a prima-facie title, at least, to the office of school treasurer, upon appointment, and, as seen, that is all that is necessary, in order to maintain the action in mandamus. There seems no escape from this conclusion, notwithstanding the stipulation of the parties. Having so decided, the court must have proceeded to the issues involved in the suit in mandamus; and there is also no escape from the conclusion that, the decision having been made that Sutherland was entitled to the office, as against Miller, the former was entitled to the possession of the books and property of the office. This must have been the result, had the hearing of the action in mandamus followed the hearing and determination of the injunction suit, had the decree in the injunction suit been introduced in evidence. In the consolidated action, both issues were heard at the same time, and, the conclusion having been reached in the injunction suit that Sutherland was legally entitled to the office of treasurer of the Independent School District of Manning, it necessarily followed that that adjudication established a prima-facie title to the office of treasurer, at least, and relief as prayed must have been decreed in the suit in mandamus. In other words, the stipulations that consoli-

dation shall be without prejudice to issues raised in the pleadings of the separate actions, did not reach the point of determining for the court the judgment which should be entered on the findings made. The decree entered, dissolving the injunction and ordering the delivery of the books and property pertaining to the treasurer's office, is— *Affirmed.*

WEAVER, C. J., GAYNOR and STEVENS, JJ., concur.